WEST POINT ISLAND CIVIC ASSOCIATION, A NON-PROFIT CORPORATION OF NEW JERSEY, AND WILLIAM S. CARY, JR., WALTER T. GUDEON AND RANDOLPH T. HOPPER, PLAINTIFFS, v. TOWNSHIP COMMITTEE OF THE TOWNSHIP OF DOVER, IN THE COUNTY OF OCEAN, STATE OF NEW JERSEY, DEFENDANTS.

Superior Court of New Jersey
Law Division

Decided November 8, 1967.

See also 93 *N. J. Super.* 206, 225 *A. 2d* 579.

*Mr. William Miller,* attorney for plaintiffs.

*Mr. Roy G. Simmons,* attorney for defendants.

MARTINO, A. J. S. C. This is an action by the West Point Island Civic Association and others seeking to compel the Township Committee of Dover Township to adopt a resolution giving its consent to annexation by the Borough of Lavallette of that part of the township known as West Point Island. The applicable statute is *R. S.* 40:43–26. The statute provides that land in one municipality may be annexed to another municipality provided certain requirements are met. The area seeking annexation must, *inter alia,* present a petition signed by at least 60% of the legal voters residing in that area to the governing body of the municipality to which it seeks annexation. According to the statute:

"Such petition shall also have attached thereto a certified copy of a resolution of the governing body of the municipality in which said land is located, consenting to said annexation, which resolution said governing body is hereby authorized and empowered to adopt."

In another phase of this same litigation the Appellate Division interpreted that language to mean that the governing body of the municipality in which the land is located does not have an arbitrary right to withhold consent to the proposed annexation but that any exercise of that power must be made in a "reasonable manner and not in a purely arbitrary way." *West Point Island Civic Ass'n v. Dover Township Committee*, 93 *N. J. Super.* 206 (*App. Div.* 1966).

A plenary hearing in the Law Division followed the Appellate Court's action, at which time the township presented reasons for its decision to deny plaintiff's petition while plaintiff presented evidence in favor of detachment.

West Point Island has been a part of Dover Township since 1767. It is approximately one-half square mile in area, located in Barnegat Bay, and practically contiguous to the Borough of Lavallette, and is separated from the mainland of Dover Township by the width of the bay. It is a 7½-mile trip from West Point Island to the business district of Dover Township by the usual method of travel via the Mathis Bridge. There is a winter population on West Point Island of approximately 84 persons and a summer population of between 2,000 and 2,500. There are about 235 homes on the island. Dover Township, on the other hand, has an area of 44.03 square miles, and according to the 1960 census had a population of 17,414. According to the 1965 tax valuations, West Point Island constituted 1.737% of the total valuation of Dover Township.

At the hearing in the Law Division petitioners introduced evidence to show that:

1. West Point Island is geographically closer to Lavallette than it is to the mainland of Dover Township. In fact, it is nearly contiguous. Moreover, the argument was made that if municipal boundaries were set on "regional" lines, West Point Island would be considered part of the Lavallette "region."

2. Because of geographic proximity, the Lavallette Police and Fire Departments are better able to respond to emergency calls from West Point Island than are the police of Dover Township. In fact, fire protection is now being provided by the Lavallette Volunteer Fire

Company, which is paid for its services in connection with West Point Island by Dover Township.

3. There would not be any appreciable loss of revenue to Dover Township if West Point Island were separated. The difference in the tax rate with or without West Point Island ratables is only four points. Moreover, it is pointed out that this calculation is made without reference to possible savings to Dover Township in being relieved of rendering municipal services.

4. Water is currently being supplied to West Point Island by Lavallette pursuant to the New Jersey Water Policy Commission grant of diversionary rights to Lavallette.

5. The Dover Township Sewage Authority is independent of Dover Township, and in the event of annexation of West Point Island to Lavallette the area to be served by the Authority will remain unchanged.

6. 74% of the taxpayers and 90% of the voters of West Point Island have signified their desire in favor of detachment.

7. The residents of West Point Island use Lavallette as their mailing address and can maintain P. O. boxes in the Lavallette Post Office.

Although Dover Township never gave a specific statement of findings nor made any findings of fact which directly indicate its reasons for denying plaintiff's application, certain conclusions may be drawn from the testimony and evidence elicited at the hearing in the Law Division. Basically, the township's argument against detachment can be summarized as follows:

1. The consent of the township would set a precedent for future action in other areas of the township.

2. Dover Township provides a fine school system as well as many recreational and communal activities, all of which are available to the residents of West Point Island as well as other residents of the township.

3. The township claimed that the services which are made available to the residents of West Point Island, such as police, fire, civil defense, disaster-aid, water and sewage, are quite adequate to cover any need that could be expected to arise.

4. West Point Island is a socially desirable area and enhances the cultural value and attractiveness of Dover Township, and all planning done by the township has encompassed West Point Island as part of the community.

Parenthetically, it may be observed at this point that the first reason outlined, *viz.,* that the consent of the municipality

would set a precedent for future action in other areas of the township, might be the underlying rationale which motivated the township in denying its consent. Mayor Woods, on direct examination, candidly said:

"\* \* \* one very definite reason why we object to the secession of West Point Island from Dover Township, is for the precedent, that it will provide for the possibility of other areas not only in Dover Township but throughout the State of New Jersey to secede from their municipality."

Even more illuminative is the colloquy between the court and township committeeman Wheeler. Wheeler testified on direct examination that one reason for denying plaintiff's petition "would be the possible precedent that this would set." Later, on cross-examination the court, in order to clarify a question, asked:

"THE COURT: What do you mean 'would set a precedent', Mr. Wheeler?

THE WITNESS: Your Honor, I am talking in terms of the language that I recall it on a petition which described the contiguous land area and if my recollection serves me properly, this was one of the two reasons that the people of West Point Island used in their petition, the geographic contiguous position to Lavallette and the signers of the petition and legal voters and so on. Unless I am very much mistaken, they were the two reasons given, and in my understanding of it, if the Township Committee had consented on this basis that we would then be consenting possibly to future annexation of other areas of Dover Township that might be contiguous to some other municipality because of the nature of the land area itself.

MR. MILLER: You appreciate, do you not, that each case would be determined on its own merits?

MR. WHEELER: Yes, sir; I do."

At this juncture it should be noted that the applicable statute, *R. S.* 40:43–26, states no guiding standard as to the factors a governing body should weigh in deciding whether to approve a detachment, nor is there any judicial expression in New Jersey. Proceeding under their own statutes, other jurisdictions have, however, expressed views on what circumstances should move local governments to approve the detachment of territory from a municipality.

In some jurisdictions it is specifically required by statute that the territory sought to be severed from a city or town must be contiguous to the boundary of the city or town. *People ex rel. Village of South Barrington v. Village of Hoffman Estates,* 30 Ill. 2d 385, 198 *N. E.* 2d 97 (*Sup. Ct.* 1964) ; or that such territory be unplatted, *Young v. Carey,* 184 *Ill.* 613, 56 *N. E.* 960 (*Sup. Ct.* 1900) ; or that it be used exclusively for agricultural purposes, *Cavert v. Board of Com'rs of Renville County,* 153 *Minn.* 360, 190 *N. W.* 545 (*Sup. Ct.* 1922). Similarly, some statutes provide that detachment may result where justice and equity require it. *Christensen v. Town of Clearfield,* 66 *Utah* 455, 253 *P.* 376 (*Sup. Ct.* 1926) ; where there is a lack of municipal improvement, *Burton v. Town of Sheridan,* 80 *Colo.* 361, 251 *P.* 725 (*Sup. Ct.* 1926), and where the symmetry of the corporate limits would not be disturbed, *Maxwell v. City of Buhl,* 40 *Idaho* 644, 236 *P.* 122 (*Sup. Ct.* 1925).

A statute more like New Jersey's is the detachment statute of Indiana, *Indiana Acts of 1907,* c. 279, § 7, *pp.* 617–620. This statute, prescribing the method of disannexing territory from towns, provides, *inter alia,* that the inhabitants of an area seeking detachment file their petition with the board of town trustees praying for disannexation, setting forth as part of the petition a plat of the land sought to be disannexed, and giving notice as provided by law of the time and place of hearing. While this statute differs from ours in one major respect, to wit, notice and hearing, it is similar insofar as it fails to establish any standard or guideline by which to review the petition and decision of the board.

The Indiana appellate court recognized that very problem in *Riffle v. Town of Newton,* 94 *Ind. App.* 451, 181 *N. E.* 290, 291 (1932), when it said:

"* * * it is left to the sound legal discretion of the tribunal acting upon the petition for disannexation * * * the law does not state what facts shall constitute grounds for disannexation, neither what are and are not sufficient reasons therefor."

The court held that the town, being rural in nature, could not reasonably be maintained unless the petitioners' premises was retained therein, and upheld the lower court's finding that disannexation would be an injustice to the town.

The State of Illinois likewise has a disconnecting statute. It differs from ours in that it prescribes certain conditions which must be met before disconnection can be pursued, and also provides for a hearing after publication in a newspaper having general circulation within such municipality. In *Anderson v. City of Rolling Meadows,* 10 *Ill. 2d* 54, 139 *N. E. 2d* 199 (*Sup. Ct.* 1956), the court held:

"The county judge, after hearing the evidence and having in mind that petitioner must sustain the burden of proving the statutory requisites for disconnection, found that all the allegations of the petitioner had been proved. Such a finding will not be disturbed unless it is found to be palpably against the manifest weight of the evidence."

Another leading case in the area of detachment and one which is factually similar to the case at bar is *McKeon v. City of Council Bluffs,* 206 *Iowa* 556, 221 *N. W.* 351, 62 *A. L. R.* 1006 (*Sup. Ct.* 1928). The facts were that through a process of avulsion the Missouri River isolated a parcel of land from the mainland of Iowa. The territory was separated from the City of Council Bluffs by a river three-eighths of a mile wide although it was technically within the corporate limits of the city. The parcel was surrounded by the river on one side and adjoining territory of the City of Omaha, Nebraska, on the other. The facts showed, *inter alia:*

1. The usual route between the area sought to be severed and the main part of Council Bluffs is west and south 3¾ miles through Omaha to the Douglas Street Bridge, which is a toll bridge.

2. The distance to the nearest high school in Council Bluffs is 6 miles.

3. To the business center of Council Bluffs it was 7⅞ miles.

4. To the city hall and courthouse, 8¼ miles.

5. To the nearest fire station, 6½ miles.

6. The number of permanent residences was about 700.

7. There was one public school in the territory sought to be severed.

8. No other public buildings were located there.

9. Council Bluffs furnished 1,000 feet of fire hose, but fire protection came from Omaha.

10. Council Bluffs furnished police protection during the summer season, but calls upon the Omaha Department in cases needing more expeditious attention were made and supplied.

11. In cases of arrest the prisoner had to be taken through Nebraska territory to the station east of the river.

12. Reliance for police protection was chiefly upon the Omaha force.

13. Postal service was from the Omaha post office.

The Iowa Supreme Court affirmed the trial court and found that the territory in question was not needed for the growth of the city or other municipal purposes, and that were it not for state lines, the territory would belong to Omaha and not Council Bluffs. Moreover, it found that there was no showing that inhabitants of the territory would have anything to gain by continuing as part of the city in the future.

West Point Island seems to be in a similar factual circumstance, separated as it is from Dover Township by the breadth of Barnegat Bay and apparently dependent upon Lavallette for most emergency services.

Thus, it remains to be determined whether in light of the above judicial expressions the township committee acted arbitrarily and without relation to any reasonable criteria, or whether its action was founded on sound policy and reason.

██ Considering the township's case first, it seems clear that the fear of setting a precedent for other areas fails on at least two grounds. First, it is admittedly unfounded since each case, according to the understanding of the township committeeman, would be decided on its own merits.

Secondly, if such a fear were legally sufficient for denying detachment, this would effectively write off the annexation statute for all intents and purposes.

██ As to the contentions of Dover Township that it provides a fine school system, recreational areas and communal

facilities, it is sufficient to point out that none of these facilities would be adversely affected or would be changed in function one iota if West Point Island were detached. Moreover, with regard to any claim that West Point Island was included in any plans of Dover Township, it should be noted that there was a failure of evidence as to any educational or recreational planning or facilities which were particularly related to West Point Island. Nor could the inference be drawn from the testimony that the separation of West Point Island from Dover Township would interfere with the township's plans for the redevelopment of recreational facilities.

These same considerations apply with equal force to other municipal services currently being provided by Dover Township, such as police and disaster aid. Moreover, it is noteworthy that services such as fire protection and water are currently being physically supplied from Lavallette. Moreover, the sewage authority representative admitted during the hearing that the Authority would continue totally unaffected by the results of the annexation proceeding, thus illustrating Dover Township's absence of interest, let alone adverse interest in the effect of the annexation with respect to operation and finances of the Dover Township Sewage Authority.

A key factor in any detachment suit is, of course, the financial situation. However, neither Mayor Woods nor Committeeman Wheeler was able to establish any material financial disadvantage whatsoever as a result of the proposed secession of West Point Island from Dover Township. Both testified that they were unable to state the financial affect to Dover Township if detachment were permitted. As noted heretofore the difference in the tax rate without West Point Island ratables would be four points according to the township auditor. However, this calculation was made without allowing for any savings that would accrue to Dover Township since it would no longer be obligated to render services or pay tuition for West Point Island school children. Public works, police, fire, health, garbage and other services of Dover Township, to the extent they are now rendered on West Point

Island, would represent a net saving to Dover Township if detachment was granted.

Thus, viewing the township's case in this posture, it can be seen that at best the evidence presented by the township is relevant only with regard to the wisdom of West Point Island's action in seeking to withdraw from Dover Township. However, the residents of West Point Island, in petitioning for annexation to Lavallette, have overwhelmingly determined this question for themselves, and the court is only faced with weighing the various elements presented, giving due regard to the presumption of validity attending municipal action.

When the reasons presented by the township are weighed against the factors produced by 74% of the taxpayers and 90% of the voters, they seem to lose any major significance they may have had. Thus, geographic proximity to Lavallette, availability of emergent fire and police protection coupled with an already existing water supply from that municipality, and a minimal loss of revenue to Dover Township, all point to the finding that the conclusionary statement of the resolution of the township committee that it would "not be in the best interests of all the people of the Township of Dover" to consent to the annexation of West Point Island by Lavallette was not based on reasonable grounds.

The township is therefore ordered to affix its consent to plaintiff's application.